IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

KATHERINE L. MACGREGOR,

                Plaintiff,                          CV-09-6016-ST

        v.                                          FINDINGS AND
                                                    RECOMMENDATION
MICHAEL J. ASTRUE,
Commissioner of Social Security,

                Defendant.

_____

STEWART, Magistrate Judge:

## <u>INTRODUCTION</u>

Plaintiff, Katherine L. MacGregor ("MacGregor"), seeks judicial review of the final

decision by the Social Security Commissioner ("Commissioner") denying her application for

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("SSA"),

42 USC §§ 401-433 (2008).  This court has jurisdiction to review the Commissioner's decision

pursuant to 42 USC § 405(g) and § 1383(c)(3).  For the reasons set forth below, that decision

should be REVERSED and REMANDED.

## ADMINISTRATIVE HISTORY

MacGregor protectively filed for SSI on August 1, 2004, alleging a disability onset date

of January 15, 1991.  Tr. 65-67.[1]  Her application was denied initially and on reconsideration.

On July 23, 2008, a hearing was held by video conference before Administrative Law Judge

("ALJ") Brenton L. Rogozen.[2]  Tr. 309-36.  The ALJ issued a decision on September 16, 2008,

finding MacGregor not disabled.  Tr. 10-21.  The Appeals Council denied MacGregor's request

for review on November 10, 2008 (Tr. 4-7), making the ALJ's decision the Commissioner's final

decision.

## BACKGROUND

MacGregor was born on October 13, 1958, and was 49 years old at the time of the

hearing before the ALJ.  Tr. 65, 316.  She has a high school education and no past relevant work

experience.  Tr. 20, 316.  She alleges that she is unable to work due to arthritis, carpal tunnel

syndrome, fibromyalgia, asthma, and hives.  Tr. 10.

### I.    Claimant's Testimony

In her written testimony dated May 21, 2005, MacGregor stated that she feels pain all the

time in most parts of her body.  Tr. 126.  She can be up about 30 minutes before needing to rest

and cannot finish most tasks that she has started.  Tr. 127.  In her later written testimony dated

---

[1] Citations are to the page(s) indicated in the official transcript of record filed on May 21, 2009 (docket #15).

[2] The ALJ's opinion indicates that the hearing was held on July 24, 2008 (Tr. 10), but the hearing notice (Tr. 24), requesting an in-person hearing (Tr. 143) and the hearing transcript (Tr. 309-36) indicate that the hearing was held on July 23, 2008, by video conference.

September 24, 2005, she stated that each day is different. Tr. 78.  Some days she just lies in fetal position due to pain and cannot sit or stand, while other days she is able to do laundry and other tasks.  *Id*.  She takes care of her 10 year old son, with help from her 18 year old daughter.  Tr. 79. She has a hard time keeping up with the dishes and other household chores, falls a lot, does not engage in any hobbies, but does watch television.  Tr. 80-82.

At the hearing on July 23, 2008, she reported still experiencing vertigo and becoming physically sick and nauseous.  Tr. 321-22.  Even with medication, she still feels depressed. Tr. 326.  Due to pain in her back, her activities are limited.  Tr. 327.  She does not sweep or fold clothes.  Tr. 327-28.  Her son and daughter help with household activities and chores.  Tr. 333. She is limited to standing no more than 15 to 20 minutes at a time and can sit for about 20 minutes at a time.  Tr. 329-30.  She lays down during the day for about 20 minutes at a time. Tr. 330.  She has problems with cramping in her hands which limits her ability to write, has problems holding on to things, and gets migraine headaches on a monthly basis.  Tr. 331-32.

## II.    **Medical Records**

Despite alleging a disability onset date of January 15, 1991, MacGregor's first medical record is from January 2002.  Tr. 217.  At that time, MacGregor was seen by Dr. Lawrence Barnes, M.D., for complaints of fibromyalgia pain which were recently exacerbated after a painting project.  *Id*.  MacGregor reported that she had a 10-year fibromyalgia history and had been previously seen by another physician who had placed her on various medications, including Prozac, Ibuprofen, Flexeril, and Vicodin, though she had not taken those medications for approximately three months.  *Id*.  At a follow up visit on February 20, 2002, Dr. Barnes noted

that MacGregor reported that the combination of the medications was helping and felt she could function.  Tr. 216.

Throughout 2002, Dr. Barnes continued to see MacGregor on a regular basis, primarily for pain associated with fibromyalgia and arthritis in her joints, hips, back, chest, and neck. Tr. 210-16.  Dr. Barnes continued to monitor MacGregor's pain medications, placing her on an informed consent for using chronic long-term pain medication on April 2, 2002.  Tr. 215.  An April 2, 2002 radiograph confirmed osteoarthritis of the knees and hips, and on December 30, 2002, Dr. Barnes diagnosed MacGregor with carpal tunnel syndrome.  Tr. 210, 215.  During this period, Dr. Barnes noted that MacGregor had frequent tenderness, was unable to touch her chin to her chest or shoulders, and felt exacerbated pain after working out in the yard or sitting or standing for long periods of time.  Tr. 211, 214-15.

On February 11, 2003, MacGregor reported that she was experiencing problems with her left knee.  Tr. 208.  Dr. Barnes noted that all range of motion caused pain in the patella.  *Id*.  He ordered an x-ray and referred MacGregor to Marcus L. Pollard, M.D.  *Id*.  Because MacGregor also reported symptoms of depression, Dr. Barnes prescribed Prozac, in addition to renewing her other medications.  *Id*.

For the next several months, Dr. Barnes continued to see MacGregor regularly for medication management, complaints of leg pain, heartburn, depression, anxiety, panic attacks, and difficulty sleeping.  Tr. 206-08.  On June 10, 2003, Dr. Barnes wrote a note for MacGregor stating that she could not be involved in gainful employment because, given her history, there would be times when she could work, and times where she could not.  Tr. 206.

On October 3, 2003, MacGregor saw Dr. Barnes complaining of right knee stiffness and fibromyalgia pain.  Tr. 204.  Dr. Barnes noted that Dr. Pollard had previously performed surgeries on both knees and opined that MacGregor probably had a meniscal tear.  *Id*.  He prescribed a knee wrap, heat and ice, and renewed MacGregor's medications.  *Id*.

Throughout 2004, Dr. Barnes treated MacGregor regularly for pain symptoms associated with fibromyalgia.  Tr. 194-97, 199, 203-04.  MacGregor reported that her pain seemed to increase with cold weather and increased activity, such as when grouting tile.  Tr. 204.  In February 2004, MacGregor reported that the Flexeril had decreased its effectiveness for her fibromyalgia pain, so Dr. Barnes prescribed a different muscle relaxant.  Tr. 203-04.  During this time, Dr. Barnes also treated MacGregor for recurrent hives, including prescribing medication and referring her to an allergist.  Tr. 201-02.

By August 18, 2004, MacGregor requested a change in pain medications since she was using to eight Vicodin a day.  Tr. 198.  Dr. Barnes prescribed Oxycodone for her fibromyalgia pain, and by September 24, 2004, MacGregor reported that she was experiencing increased comfort.  Tr. 196, 198.

On September 9, 2004, MacGregor reported that the new muscle relaxant was not very helpful for her knee pain and asked whether she could switch to Soma.  Tr. 197.  Dr. Barnes discussed the negative effects of Soma, including addiction, and instructed her to continue with the remainder of her medications.  *Id*.  Dr. Barnes observed that MacGregor was "unable to sit for any length of time in that she must be able to move about freely to sit, stand and walk freely," and opined that she probably could "not spend 30 hours a week in a classroom or looking for a job."  *Id*.  During an examination on November 11, 2004, Dr. Barnes noted that MacGregor

could sit "fairly comfortably" on the exam table and that light touches to the upper back, shoulders, and hips caused no discomfort.  Tr. 195.

On December 27, 2004, MacGregor reported continued pain and several falls in the previous two weeks.  Tr. 193-94.  Dr. Barnes observed that she was walking with a limp, had tenderness in her hip, and experienced pain during the physical examination.  Tr. 193.  X-rays taken on December 29, 2004 revealed only mild left knee joint space narrowing and no significant abnormality of the pelvis or left hip.  Tr. 193, 231.

Throughout early 2005, Dr. Barnes monitored MacGregor's medications and treated her for fibromyalgia pain, bronchitis, and complaints of vertigo.  Tr. 191-93.  On April 7, 2005 MacGregor reported continued chronic pain, particularly in her right hip, and again requested a different muscle relaxant.  Tr. 191.  Dr. Barnes prescribed Soma, again warning MacGregor of its addictive properties.  *Id*.

On April 12, 2005, Dr. Pollard examined MacGregor due to complaints of left knee pain and pain in both hips.  Tr. 155.  X-rays revealed that MacGregor had some early arthritic changes in the hips, and the left knee had some significant medial compartment arthritis, with joint space "50% of normal."  *Id*.  On May 3, 2005 an MRI showed mild medial compartment arthritis and a non-displaced tear of the posterior horn of the medial meniscus.  Tr. 153.  Dr. Pollard discussed arthroscopy options with MacGregor and advised that surgery would not resolve the problems caused by arthritis.  *Id*.

On June 15, 2005, Dr. Pollard performed a left knee arthroscopy and meniscectomy. Tr. 148.  At follow-up visits, MacGregor reported that she was still experiencing pain and swelling in her left knee, leading Dr. Pollard to advise MacGregor that she might need a total joint replacement in the future.  Tr. 147, 188.

6 - FINDINGS AND RECOMMENDATION

Throughout the summer and fall of 2005, Dr. Barnes continued to treat MacGregor for hip pain, arthritis, fibromyalgia and depression, noting on August 16, 2005, that MacGregor had limited range of motion in her hips.  Tr. 187.  On September 15, MacGregor reported experiencing cramping in her left arm while lifting and, on October 6, 2005, she reported considerable discomfort in her back and right shoulder after trying to wrench a "CAT" heavy equipment machine out of the mud, but said that the Oxycodone was helpful for pain control.  *Id.*

On November 5, 2005, MacGregor was evaluated at the request of the Department of Disability Services ("DDS") by a consultive orthopedist, Terri Robinson, M.D.  Tr. 156-60. Dr. Robinson observed no gait disturbance and noted that MacGregor ambulated without the use of an assistive device.  Tr. 158.  Dr. Robinson did find pitting edema below the knees and noted that MacGregor had a positive Romberg test and tested positive on 18 of 18 tender points. Tr. 158-159.  Based upon these findings, Dr. Robinson diagnosed fibromyalgia, vertigo, and degenerative joint disease of the left knee.  Tr. 159.  She concluded that MacGregor could sit without limitation, had no lifting or carrying weight restrictions, and had no postural or manipulative limitations.  Tr. 159-60.  She limited MacGregor to two hours standing and walking in an eight-hour day due to her dizziness and vertigo and noted that, due to dizziness, she might benefit from a cane or other ambulatory support device while standing or walking.  *Id.*

On December 9, 2005, another DDS physician, Mary Ann Westfall, M.D., conducted a physical RFC assessment, observing that MacGregor's purported limitations were not consistent with her physical examination performance.  Tr. 166.  Dr. Westfall concluded that MacGregor had no manipulative, visual, or communicative limitations.  Tr. 164-65.  She limited MacGregor to lifting only 10 pounds frequently and 20 pounds occasionally, and standing, walking, or sitting with normal breaks for a total of six hours in an eight-hour workday.  Tr. 162.  In

7 - FINDINGS AND RECOMMENDATION

addition, MacGregor should only occasionally kneel, crouch, crawl, or climb a ladder, rope or scaffold, and should avoid concentrated exposure to hazards. Tr. 163, 165. In so finding, Dr. Westfall gave only partial weight to Dr. Robinson's assessment, citing that MacGregor's vertigo and left knee had improved. Tr. 167.

On January 10, 2006, MacGregor returned to Dr. Barnes with complaints of dizziness, hives, and continuing fibromyalgia pain. Tr. 186. Dr. Barnes renewed MacGregor's prescriptions, including Antivert, Ativan, Soma, and Oxycodone. *Id*. On March 3, 2006, MacGregor reported that her neck and shoulder discomfort was getting worse and she was unable to do "lots of yard work." Tr. 184. On April 6, 2006, based on complaints of bilateral wrist numbness and tingling, Dr. Barnes assessed MacGregor for carpal tunnel syndrome. Tr. 183. A nerve conduction study on April 19, 2006, found no electro diagnostic evidence of carpal tunnel syndrome or right ulnar mononeuropathy. Tr. 218-19.

On April 24, 2006, Charles Stringham, M.D., examined MacGregor who was complaining of nausea, vomiting, lightheadedness, vertigo, and a recent fall. Tr. 182. He observed that when in the Romberg position, MacGregor "consistently fell backward and had to be supported." *Id*. A head CT and chest x-ray taken that day came back normal. Tr. 228-29. Two days later, MacGregor presented with similar complaints, leading Dr. Stringham to conclude that she was experiencing withdrawal symptoms. Tr. 181. He recommended discontinuing some of her medications and indicated that MacGregor might be a good candidate for a neurology consult. *Id*. On May 31, 2006, Dr. Stringham observed that MacGregor's medical management and status were unchanged, as she continued to "have variable problems of pain, dizziness, vertigo, nausea, vomiting, shortness of breath, forgetfulness, confusion and multiple other symptoms." Tr. 180.

8 - FINDINGS AND RECOMMENDATION

On June 2, 2006, MacGregor reported difficulty standing for long periods of time, but was able to do some yard work.  Tr. 179.  Dr. Barnes noted on July 20, 2006, that MacGregor reported using more Oxycodone than prescribed.  Tr. 177.

During August 2006, McGregor complained of recurrent migraine headaches and pain.  Tr. 176-77.  On September 25, 2006, MacGregor reported that her pain was well controlled with the Oxycodone, Cymbalta, and Ibuprofen.  Tr. 174.  On October 6, 2006, knee x-rays revealed mild narrowing of the left knee medial joint, but were otherwise normal.  Tr. 173, 227.  On October 9, 2006, MacGregor said that she had lost her pain medications while hunting with her husband, but after finding them the next day, she felt better and had less pain.  Tr. 173.

On November 7, 2006, Dr. Pollard noted that recent x-rays showed mild to moderate arthritis, but that the joint space was reasonably well maintained.  Tr. 235.  He opined that given MacGregor's reports of a progressively more painful left knee, a total arthroplasty was an option, but not necessary.  *Id.*  Dr. Pollard characterized MacGregor's activity level as sedentary, and told her that it would be imperative for her to lose weight prior to having a joint arthroplasty.  *Id.*

On November 14, 2006, MacGregor complained of a severe migraine headache and expressed concern about being addicted to Oxycodone after experiencing withdrawal symptoms when she had no narcotics for 12 hours the previous day.  Tr. 171.  Dr. Barnes noted that she was taking 24 Oxycodone daily, in addition to her other medications.  *Id.*  On December 4, 2006, MacGregor reported that her pain medication regimen allowed her to do laundry and housework at home.  Tr. 170.  For the remainder of 2006 and early 2007, Dr. Barnes continued to monitor MacGregor for chronic pain, osteoarthritis, depression, psoriasis, carpal tunnel, urticaria, and vertigo.  Tr. 170-71.

9 - FINDINGS AND RECOMMENDATION

Dr. Pollard evaluated MacGregor on February 8, 2007, for possible knee surgery, but decided that surgery was not necessary because there was still "a lot of cartilage remaining." Tr. 234. Instead, he recommended physical therapy. *Id*.

On March 1, 2007, Dr. Barnes evaluated MacGregor for increasing muscle spasms and tightness in her upper back. Tr. 251. Two days later, MacGregor failed to keep her appointment. *Id*. On March 29, 2007, MacGregor left without leaving a urine sample, despite being instructed to do so. Tr. 250.

On May 8, 2007, MacGregor reported that she had twisted her back and injured her right wrist and arm after falling in her laundry room, though x-rays revealed no fracture or other abnormality. Tr. 248, 276. Without her pain medications, MacGregor reported that she was unable to make her bed, clean her house, perform yardwork, or care for her animals. Tr. 248. On examination, Dr. Barnes found that she had 14 of 16 tender points for fibromyalgia. *Id*. He renewed her medications. *Id*. In a letter of that same date to MacGregor's attorney, Dr. Barnes stated that while MacGregor could "probably perform sedentary work requiring minimal lifting," she could not perform those tasks consistently over an eight-hour day. Tr. 236. Moreover, he indicated that MacGregor would need to alternate positions at will and might have to lie down during the day. *Id*. He further opined that MacGregor would likely have multiple health-related absences if working full-time. and concluded that her fibromyalgia, degenerative arthritis, and migraine headaches would preclude her from sustaining full-time employment. Tr. 236-37.

On May 12, 2007 MacGregor presented at the emergency room with complaints of stomach pain, low back pain, headache, nausea, and vomiting, aggravated by her recent fall. Tr. 273. On examination, Matthew Fahey, M.D, found that her abdomen was swollen. *Id*. MacGregor reported that the bloating had decreased her appetite and that she had not been taking

10 - FINDINGS AND RECOMMENDATION

her usual pain medications.  *Id*.  Dr. Fahey provided pain medication, and MacGregor's symptoms improved.  *Id*.

Three days later, on May 15, 2007, at the instruction of Dr. Barnes, MacGregor reported to the emergency room with similar problems.  Tr. 264.  A CT scan revealed an umbilical hernia which was repaired that same day.  Tr. 267-69.  Upon discharge on May 17, 2007, Robert McGreevey, M.D., observed that MacGregor's "heavy use of narcotic pain medication" made treating post-operative pain more difficult.  Tr. 268.  He instructed her to continue her home medications, including taking Oxycodone every four hours, and noted that she had "800 tablets" of Oxycodone at home.  *Id*.  On May 25, 2007, MacGregor asked Dr. Barnes for more Oxycodone and admitted using eight Oxycodone every four to six hours in excess of her prescribed dose.  Tr. 247.  On June 8, 2007, Dr. Barnes again noted that MacGregor was taking more of her Oxycodone than prescribed.  Tr. 245.

On June 22, 2007, MacGregor reported that she had fallen down the stairs after her knee "locked up" on her.  Tr. 244.  X-rays revealed no fractures or acute abnormalities.  Tr. 260.  At the follow-up visit on June 25, 2007, MacGregor was walking without crutches or a cane, despite being instructed to stay off her feet and use crutches when necessary.  Tr. 244.  Dr. Barnes discussed changing her Oxycodone dose, but MacGregor declined.  *Id*.  He noted that MacGregor was unable to seek gainful employment at that time.  *Id*.

On July 9, 2007, MacGregor reported to Dr. Barnes that her fibromyalgia pain was the same, but that her knee pain was slowly improving.  Tr. 243.  Without pain medication, MacGregor reported that she was bedridden, but with pain medication was able to ambulate around the house and perform activities of daily living.  *Id*.  MacGregor was asked to leave a urine sample, but failed to do so.  *Id*.  Since this was the second time MacGregor did not leave a

11 - FINDINGS AND RECOMMENDATION

requested urine sample for a drug screen, Dr. Barnes decided to discharge her from his care, providing her 30 days to find another primary care physician. *Id*.

On August 10, 2007, MacGregor arrived at Dr. Barnes' office without an appointment, expecting to be seen. Tr. 242. Dr. Barnes wrote one final prescription for Oxycodone and reminded her that her last day in his care would be August 17, 2007, due to her noncompliance. *Id*. On August 13, 2007, MacGregor reported to Dr. Barnes' office with right knee pain and urinary incontinence. Tr. 240. At that time, she was taking Oxycodone, Soma, and Ativan together, and Dr. Barnes advised her that she should not be taking the Soma and Ativan together. *Id*.

On August 22, 2007, Dr. Barnes' office refilled MacGregor's Oxycodone prescription, but on September 5, 2007, referred her to a walk-in clinic or the emergency room. *Id*.

On September 7, 2007, MacGregor reported to the emergency room for issues related to chronic pain, including that she had exhausted her supply of Oxycodone. Tr. 289-90. Robert Jacques, M.D., assessed MacGregor's degenerative arthritis of the knees, fibromyalgia, depression and headaches, and provided limited medication refills. Tr. 290-91. He discussed with her the importance of weaning herself off her heavy use of opiates. Tr. 290.

On September 20, 2007, MacGregor saw Raymond M. Baculi, M.D. for an initial visit. Tr. 284. Dr. Baculi noted her history of depression, bilateral hip and knee pain, right shoulder pain, low back pain, and insomnia. *Id*. He presented MacGregor with a pain contract, requiring her to use only one pharmacy for pain medication. *Id*. He also switched from Oxycodone to Morphine and renewed the Cymbalta, Ibuprofen, Soma, Ativan, and Trazedone prescriptions. *Id*.

On October 11, 2007, MacGregor reported to Dr. Baculi that she was doing well with her current pain medications.  Tr. 282.  She failed to keep her appointments on November 20, 2007, and January 7, 2008.  Tr. 280, 281.  On December 21, 2007, MacGregor was brought by ambulance to the emergency room with nausea, fever, confusion, and a severe headache.  Tr. 291.  A head CT and x-ray revealed no abnormalities.  Tr. 292.  She was admitted for observation, fluids, fever control and pain support.  *Id*.

On January 8, 2008, MacGregor requested a prescription from Dr. Baculi's office and was told she would need to provide a urine sample.  Tr. 279.  MacGregor responded that she would be unable to do so and would come back later.  *Id*.  When offered water, she claimed that she had Gatorade in her car and left, returning approximately 90 minutes later.  *Id*.  Upon return, she claimed that she still could not provide a sample, even after drinking water.  *Id*.  After going in and out of the restroom several times, MacGregor indicated that she had left her sample, signed for her prescription and left.  *Id*.  No sample was found, and after an unsuccessful attempt to reach MacGregor by telephone, she was sent a termination letter by registered mail.  *Id*.

On March 29, 2008, MacGregor presented at the emergency room with injuries to her lower back and arm caused by an assault which she reported to police.  Tr. 294.  An x-ray revealed no fractures, and MacGregor was discharged with a sling, Vicodin, and Ibuprofen and instructions to follow up with her primary care physician.  *Id*.

On March 13, 2008, Maribeth Kallemeyn, Ph.D., a licensed clinical psychologist, conducted and intellectual assessment of MacGregor.  Tr. 298-307.  Dr. Kallemeyn concluded that MacGregor fell near the low end of the low-average intellectual functioning range and that her anxiety, depression and tendency to socially isolate "could mildly interfere with concentration, persistence, and social interactions in a work setting."  Tr. 306-07.

## DISABILITY ANALYSIS

In construing an initial disability determination under Title XVI, the Commissioner engages in a sequential process encompassing between one and five steps.  20 CFR § 416.920; *Bowen v. Yuckert*, 482 US 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity.  If so, the claimant is not disabled.  20 CFR § 416.920(a)(4)(I).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement.  20 CFR §§ 416.909, 416.920(a)(4)(ii).  Absent a severe impairment, the claimant is not disabled.  *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.  20 CFR § 416.920(a)(4)(iii); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments.  20 CFR § 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work.  20 CFR § 416.920(a)(4)(iv).  If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national

economy.  *Yuckert*, 482 US at 142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9ᵗʰ Cir 1999); 20 CFR § 416.920(a)(4)(v).

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F3d at 1098.  If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC.  *Id.*  If the Commissioner meets this burden, then the claimant is not disabled.  20 CFR § 416.966.

### ALJ'S FINDINGS

At step one, the ALJ concluded that MacGregor has not engaged in any substantial gainful activity since the onset of her alleged disability.  Tr. 11, 20.

At step two, the ALJ determined that MacGregor suffers from the severe impairments of fibromyalgia, obesity, and osteoarthritis.  *Id*.  The ALJ also found MacGregor's possible carpal tunnel, asthma, hives, arm-shakiness, finger-tingling, migraine headaches, depression and anxiety with panic attacks, back and neck pain, and vertigo to be non-severe.  Tr. 11.

At step three, the ALJ concluded that MacGregor does not have an impairment or combination of impairments that meets or equals any of the listed impairments.  Tr. 15, 20.  The ALJ decided that MacGregor has the RFC to perform a wide or essentially full range of sedentary work, with the use of a cane if desired and ususal breaks and should not drive, work with sharp objects, work near hazards such as unprotected heights, or close to moving, dangerous machinery.  Tr. 15-16, 20.

At step four, the ALJ  found that MacGregor has no past relevant work.  Tr. 19, 20.  At step five, the ALJ concluded that considering MacGregor's age, education, and RFC, she was capable of performing other work that exists in significant numbers in the national economy.  *Id*.

In so finding, the ALJ relied solely upon the Medical-Vocational Guidelines.  *Id*.  Accordingly, the ALJ concluded that MacGregor was not disabled at any point through the date of the ALJ's decision on September 16, 2008.  Tr. 21.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004).  This court must weigh the evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998).  The reviewing court may not substitute its judgment for that of the Commissioner.  *Id*, citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).  Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading.  *Lingenfelter*, 504 F3d at 1035; *Batson*, 359 F3d at 1193.

## FINDINGS

MacGregor asserts that the ALJ's decision should be reversed and remanded for an award of benefits because it is not supported by substantial evidence and contains errors of law.  MacGregor contends that the ALJ erred by mechanically applying the Medical-Vocational Guidelines in a borderline situation, rejecting the opinion of one of her treating physicians, and discounting her testimony regarding her limitations and the severity of her symptoms.

**I.**     **Application of the Medical-Vocational Guidelines**

MacGregor argues that the ALJ erred by mechanically applying the Medical-Vocational Guidelines ("grids").  At the time of the ALJ's decision on September 16, 2008, MacGregor was less than one-month shy of her 50th birthday.  Given her age on the "borderline," MacGregor contends that she should have been placed in the higher age category which, according to the grid rules, would have deemed her disabled.

At step five, the Commissioner must show that the claimant can do other work that exists in the national economy.  *Andrews v. Shalala*, 53 F3d 1035, 1043 (9th Cir 1995).  The Commissioner can satisfy this burden either by applying the grids at 20 CFR § 416.967 or by eliciting the testimony of a vocational expert  ("VE") with a hypothetical question that sets forth all the limitations of the claimant.  *Id*.  The Commissioner can use the grid's age categories to decide disability questions.  *Calvin v. Heckler*, 782 F2d 802, 804-805 (9th Cir 1986).  However, the regulations instruct that age categories are not to be applied mechanically in "borderline" situations.  20 CFR § 404.1563(a).  Rather, when a claimant is "within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that [the claimant is] disabled," the ALJ must "consider whether to use the older age category after evaluating the overall impact of all the factors in [the] case."  20 CFR § 404.1563(b).  "It is incumbent upon the secretary to decrease his reliance upon the grids in cases where the individual claimant's circumstances approach the upper limits of the grid's guidelines."  *Russell v. Bowen*, 856 F2d 81, 84 (9th Cir 1988) (citation omitted).  The Ninth Circuit has advised that in such situations, the better method to demonstrate the claimant's abilities is through testimony of a VE.  *Gonzalez v. Sec'y of Health and Human Svcs.*, 784 F2d 1417, 1420  (9th Cir 1986).

MacGregor fell within the age 45-49 category at the time of the ALJ's decision on September 16, 2008.  20 CFR § 404.1563(c); *see Russell*, 856 F2d at 83-84 (finding that when the Appeals Council denies review without issuing a decision of its own, the claimant's age on the date of the ALJ's decision is determinative).  Because MacGregor was less than one month from reaching age 50 at the time, she was within a few days to a few months of reaching an older age category.  Unlike a person in the 45-49 age category, grid rule 201.12, CFR Pt. 404, Subpt. P, App.  2, Table No. 1, dictates that a person age 50-54 should be found disabled if that person is limited to sedentary work, is a high school graduate, and has unskilled or no prior work experience.  The ALJ found that MacGregor was limited to sedentary work, had only a high school education, and had no prior work experience.  Had the ALJ used the 50-54 age category for all or part of the relevant time period, MacGregor should have been found disabled. Therefore, the ALJ was required to consider whether to use the older age category after evaluating the overall impact of all the factors in the case.  20 CFR § 404.1563(b).

The ALJ addressed MacGregor's age as follows:

> Born on October 13, 1958, the claimant was a '32' year-old individual at the time of her alleged disability onset date; she was '45' when she filed her SSI application, and she is currently '49' years of age.  This [sic] she would be defined in the Regulations as a "younger individual" throughout all relevant periods.

Tr. 19.

The ALJ failed to mention MacGregor's close proximity to the higher age category, much less discuss the significance of her "borderline" age or analyze whether to apply the higher age category.  "Without a record of the ALJ's reasoning regarding plaintiff's borderline age, it is impossible for this Court to determine that the ALJ expressly considered which age category to

use, as required by 20 CFR § 404.1563(b)." *Corbin v. Astrue*, 2009 WL 799268 at *12 (ED Cal March 23, 2009); *see Bray v. Comm'r of Soc. Sec. Admin.*, 554 F3d 1219, 1229 (9th Cir 2009) (remanding to reconsider disability status of claimant who aged into older disability age category after the ALJ's decision); *Moore v. Apfel*, 216 F3d 864, 868 (9th Cir 2000) (remanding for evaluation of further evidence relating to the existence of substantial gainful work after claimant had attained age 50). While the ALJ provided some insight as to why he classified MacGregor in the "younger age category," his reasoning falls short of demonstrating that he recognized and considered the significance of her borderline age.

In any event, the ALJ erroneously relied solely upon the grids and failed to obtain testimony from a VE to determine if MacGregor was able to work. The ALJ may rely solely upon the grids only when they completely describe the claimant's limitations. *Tackett*, 180 F3d at 1101-02. Exertional capabilities are the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, or pulling and are generally defined in terms of ability to perform sedentary, light, medium, heavy, or very heavy work. *See* 20 CFR Pt. 404, Subpt. P, App. 2 § 200.00(a). "Significant non-exertional impairments make reliance on the [g]rids inappropriate" if they are severe enough to "limit the claimant's functional capacity in ways not contemplated by the guidelines." *Derosiers v. Sec'y of Health & Human Svcs.*, 846 F2d 573, 577 (9th Cir 1988). Non-exertional limitations are those that do not depend on an individual's physical strength, such as mental, sensory, manipulative and environmental limitations. *Cooper v. Sullivan*, 880 F2d 1152, 1155 n7 (9th Cir 1989). The Ninth Circuit has concluded that the need to shift positions every 30 minutes is a non-exertional limitation not contemplated by the grids, thus requiring the ALJ to take testimony from a VE. *Tackett*, 180 F3d at 1103-04. Pain can be

either an exertional or non-exertional limitation. *Id* at 1102; *Derosiers*, 846 F2d at 576-77. Pain

is an exertional limitation when it "directly affects a claimant's strength" and non-exertional

"when it does not affect a claimant's strength, but nonetheless affects a claimant's ability to

work." *Derosiers*, 846 F2d at 579.

The Commissioner may, however, rely upon the grids even when a claimant has

combined exertional and non-exertional limitations, so long as the non-exertional limitations do

not impact the claimant's exertional capabilities. *See Polny v. Bowen*, 864 F2d 661, 663-64 (9th

Cir 1988). In cases where the grids are not fully applicable, the ALJ may meet his burden under

step five of the sequential disability process by eliciting testimony from a VE to determine

whether jobs exist in the national economy that the claimant can perform despite her limitations

and restrictions. *Tackett*, 180 F3d at 1103-04.

Here, the ALJ concluded that MacGregor's ability to perform "a wide or essentially full

range" of sedentary work had not been "significantly impeded by additional exertional and/or

non-exertional limitations." Tr. 19. Because the ALJ did not establish that MacGregor could

perform the full range of sedentary jobs, application of the grids was inappropriate. Moreover,

the record establishes that MacGregor suffers from both pain and postural limitations not

covered by the grids. As discussed more fully below, the ALJ rejected the opinion of

MacGregor's primary treating physician, Dr. Barnes, that MacGregor suffered severe pain and

had non-exertional limitations such as needing to "alternate sitting, standing, and walking at will,

and she might have to lie down during the day," that precluded her from being gainfully

employed. Tr. 236. Examining physician Dr. Westfall confirmed that MacGregor has frequent

postural limitations. Tr. 163. Even if the ALJ does not consider MacGregor's pain complaints

to be non-exertional limitations, MacGregor's postural limitations related to prolonged sitting

and standing are non-exertional limitations not contemplated by the grids.  Thus, the ALJ erred

by not taking the testimony of a VE to establish whether MacGregor was disabled.

## II.    Treating Physician's Opinion

The ALJ is responsible for resolving conflicts and ambiguities in medical evidence.  *See*

*Batson*, 359 F3d at 1195 (citation omitted).  In weighing a claimant's medical evidence, the ALJ

generally affords enhanced weight to the opinion of the claimant's treating physicians if it is

"well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent" with other substantial evidence in the record.  20 CFR § 404.1527(d)(2).  "Those

physicians with the most significant clinical relationship with the claimant are generally entitled

to more weight than those physicians with lesser relationships."  *Carmickle v. Comm'r Soc. Sec.*

*Admin.*, 533 F3d 1155, 1164 (9th Cir 2008) (citation omitted).  In consequence, an uncontradicted

treating physician's opinion may only be rejected for "clear and convincing" reasons supported

by evidence in the record, and a contradicted treating physician's opinion may only be rejected

for "specific and legitimate" reasons supported by evidence in the record.  *See Reddick*, 157 F3d

at 725, citing *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1995).  Moreover, several factors

determine the weight the ALJ should give to a physician's opinion, including the length of the

treatment relationship and frequency of examination, the amount of evidence that supports the

opinion, the consistency of the medical opinion with the record as a whole and the physician's

specialty and understanding of the disability program.  *Orn v. Astrue*, 495 F3d 625, 631-632 (9th

Cir 2007), citing 20 CFR § 404.1527(d)(2).

Similarly, the ALJ is "not bound by the uncontroverted opinions of the claimant's physicians on the ultimate issue of disability" if he gives clear and convincing reasons for rejecting those opinions. *Reddick*, 157 F3d at, 725, quoting *Montijo v. Sec'y of Health & Human Servs.,* 729 F2d 599, 601 (9th Cir 1984). "A treating physician's opinion on disability, even if controverted, can be rejected only with specific and legitimate reasons supported by substantial evidence in the record. In sum, reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion." *Id* (citation omitted). When "the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, we credit that opinion 'as a matter of law.'" *Lester*, 81 F3d at 834, quoting *Hammock v. Bowen*, 879 F2d 498, 502 (9th Cir 1989).

The ALJ rejected the opinion of MacGregor's primary treating physician, Dr. Barnes, that MacGregor could not sustain full-time employment. Tr. 16. Dr. Barnes' opinion is inconsistent with those of the examining physicians, Drs. Robinson and Westfall, who indicated that MacGregor could sustain sedentary work with some exertional and postural limitations. *See* Tr. 156-68. Thus, the ALJ must provide specific and legitimate reasons supported by substantial evidence to reject Dr. Barnes' opinion.

The ALJ rejected Dr. Barnes' opinion because it was supported by assessments that were "vague, poorly-supported, contradictory, and non-durational." Tr. 16. Especially significant to the ALJ was that Dr. Barnes' treatment notes often reflected that he did not conduct physical examinations of MacGregor for her fibromyalgia, instead relying upon her subjective complaints. Tr. 17. The fact that a physician has relied on the subjective complaints of a properly discredited claimant can, in some circumstances, be a legitimate basis for disregarding

that physician's opinions.  *See Morgan v. Apfel*, 169 F3d 595, 602 (9th Cir 1999).  Proper reasons

for rejecting a physician's opinion based on discredited claimant testimony do not exist "where

the doctor does not discredit those complaints and supports his ultimate opinion with his own

observations."  *Ryan v. Comm'r*, 528 F3d 1194, 1199-1200 (9th Cir 2008) (citation omitted).

Between January 2002 and August 2007, Dr. Barnes' treatment notes are replete with

observations regarding MacGregor's account of her symptoms, as well as his impressions of her

functioning capabilities.  While Dr. Barnes relied upon MacGregor's self-report of her

symptoms, he did not discredit those self-reports and issued his opinion based, in part, upon his

own observations.  Many of Dr. Barnes' treatment notes include his own conclusions regarding

MacGregor's functioning and ability to work.  As early as May 2002, Dr. Barnes noted that

MacGregor's discomfort was aggravated by work in the yard or by sitting or standing for long

periods of time.  Tr. 214.  The following year, Dr. Barnes noted that given MacGregor's medical

history, her ability to work would fluctuate, and he did not believe she could be involved in

substantial gainful employment.  Tr. 206.  On September 9, 2004, he observed that MacGregor

was unable to sit for any length of time and he did not think that she could spend 30 hours a

week in a classroom or looking for a job.  Tr. 197.  Moreover, the record reveals that Dr. Barnes

often conducted physical examinations of MacGregor, frequently noting that she had tenderness

in her spine and hips, limited motion, moved slowly, was unable to sit for extended periods of

time, or to touch her chin to her chest or shoulders.  *See* Tr. 171, 175, 177, 187, 193-94, 199,

208, 252.

Therefore, this reason given by the ALJ to reject Dr. Barnes' opinion was not proper.

The ALJ also rejected Dr. Barnes' assessments on the basis that they were not "corroborated by dates of ongoing clinical or laboratory tests, referrals, epidurals/injections, neurosurgical evaluation or findings." Tr. 17. The record does not support this observation, but instead establishes that over the five year treatment period, Dr. Barnes often referred MacGregor for diagnostic testing, including x-rays, lab work, ultrasounds, and a nerve conduction study. *See* Tr. 218-33, 255-63. He frequently referred her to Dr. Pollard for complications related to her knee and hip pain. *See* Tr. 146-55, 234-35. In 2004, he referred her to an allergist for recurrent hives. Tr. 201-02. Moreover, in May 2007, Dr. Barnes ordered a double contrast CT scan to address MacGregor's complaints of severe abdominal pain, ultimately resulting in hernia surgery. Tr. 264.

The ALJ also rejected Dr. Barnes' opinion that MacGregor was unable to sustain full-time employment due to her fibromyalgia, degenerative arthritis, and migraine headaches, because it was not supported by objective evidence. Tr. 16. In support, the ALJ pointed to normal examination results, including x-rays, an abdominal ultrasound, and a head CT-scan. *Id*. A hallmark of fibromyalgia is that it cannot be specifically diagnosed with laboratory tests. *See Benecke v. Barnhart*, 379 F3d 587, 589 (9th Cir 2004) ("Fibromyalgia's cause is unknown, there is no cure, and it is poorly understood within much of the medical community. The disease is diagnosed entirely on the basis of patients' reports of pain and other symptoms . . . to date there are no laboratory tests to confirm the diagnosis."); *Lisa v. Sec'y of Health & Human Servs.*, 940 F2d 40, 44 (2nd Cir 1991) (Commissioner conceded that "'fibromyalgia is not easily detected by standard clinical tests"). As fibromyalgia cannot be diagnosed by laboratory tests or x-rays, a diagnosis requires at least 11 of 18 positive (tender) trigger points. *See* ARTHRITIS FOUNDATION,

FIBROMYALGIA 3, 6-7 (2001); *see also* THE GALE ENCYCLOPEDIA OF MEDICINE 1185 (Vol. 2 1999).

Virtually every time Dr. Barnes saw MacGregor, he evaluated her for fibromyalgia, documenting her subjective symptom complaints, as well as his observations and treatment recommendations. On May 8, 2007, trigger point testing revealed that MacGregor had 14 of 16 positive trigger points. Tr. 248. Two years earlier, DDS consulting physician, Dr. Robinson, found that MacGregor had 18 of 18 positive trigger points. Tr. 158-59. Despite agreeing that MacGregor's fibromyalgia was a severe impairment, the ALJ rejected Dr. Barnes' opinion that limitations related to her fibromyalgia precluded her from sustaining full-time employment. Substantial evidence in the record does not support that conclusion.

While the ALJ cited specific reasons to discount Dr. Barnes' opinion, the record lacks substantial evidence to support those reasons. Accordingly, the ALJ erred by rejecting Dr. Barnes' opinion which should be credited as a matter of law. Credited as true, his opinion supports MacGregor's claim that she is unable to work.

### III.    Claimant's Credibility

MacGregor argues that the ALJ improperly discounted her testimony regarding the severity of her limitations. When a claimant's medical record establishes the presence of a "medically determinable impairment" that "could reasonably be expected to produce the [claimant's alleged] pain or other symptoms," the ALJ must evaluate the claimant's credibility in describing the extent of those symptoms. 20 CFR § 404.1529. In the event the ALJ determines that the claimant's report is not credible, such determination must be made "with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit

claimant's testimony." *Thomas v. Barnhart*, 278 F3d 947, 959 (9th Cir 2002), citing *Bunnell v.*

*Sullivan*, 947 F2d 341, 345-46 (9th Cir 1991) (*en banc*). Unless the record has affirmative

evidence of malingering, the ALJ must offer clear and convincing reasons for rejecting the

claimant's testimony about the severity of her symptoms. *Carmickle*, 533 F3d at 1160.

When making a credibility evaluation, the ALJ may consider objective medical evidence

and the claimant's treatment history as well as any unexplained failure to seek treatment or

follow a prescribed course of treatment. *Smolen v. Chater*, 80 F3d 1273, 1284 (9th Cir 1996). In

weighing a claimant's credibility, the ALJ may also consider the claimant's daily activities, work

record, and observations of physicians and third parties in a position to have personal knowledge

about the claimant's functional limitations. *Id*. In addition, the ALJ may the ALJ may rely on:

> (1) ordinary techniques of credibility evaluation, such as the
> claimant's reputation for lying, prior inconsistent statements
> concerning the symptoms, and other testimony by the claimant that
> appears less than candid; (2) unexplained or inadequately
> explained failure to seek treatment or to follow a prescribed course
> of treatment; and (3) the claimant's daily activities.

*Id*; *see also* SSR 96-7P.

A finding that a claimant lacks credibility cannot be premised solely on a lack of medical

support for the severity of pain. *See Lester*, 81 F3d at 834. However, a credibility finding

supported by substantial evidence in the record cannot be disturbed. *Thomas*, 278 F3d at 959,

citing *Morgan v. Comm'r*, 169 F3d 595, 600 (9th Cir 1999).

Here, the ALJ concluded that MacGregor's testimony concerning the limiting effects of

her symptoms was not credible. Tr. 17-19. Since there is no evidence of malingering, the ALJ

was required provide clear and convincing reasons to reject MacGregor's testimony regarding

the severity of her symptoms.

In discrediting MacGregor's account of the severity of her symptoms, the ALJ recounted numerous inconsistencies in her testimony. Tr. 17. The ALJ noted that MacGregor claimed that she experienced pain everywhere all the time which could not be relieved by anything, yet often told her treating physicians that the pain medications were helping. *Id*. The record supports that inconsistency. The ALJ also rejected MacGregor's testimony that her pain was aggravated by "any" activity because Dr. Barnes' treatment notes indicate that she was indeed quite active at times. *Id*. The record confirms that during the period of alleged disability, MacGregor went hunting, helped her husband pull heavy equipment out of the mud, and performed household chores and yard work. *See* Tr. 170, 173, 184, 187, 243. The ALJ further questioned MacGregor's testimony that her symptoms have required her to use ambulatory devices for all movements since 1991. Tr. 17. The ALJ accurately noted that she did not present with any ambulatory device at an examination on November 5, 2005, and had a normal gait. *Id*. The record also shows that after bruising her knee from a fall on June 22, 2007, MacGregor was instructed to use crutches, yet arrived at her follow-up visit walking without crutches or a cane. Tr. 244.

In addition, the ALJ found that MacGregor's account of her symptoms was undermined because she failed to follow her prescribed course of treatment. He noted evidence that MacGregor had been abusing her pain medications and was discharged from two treating sources for failing to give urine samples for drug screens. Tr. 18. Not only did Drs. Barnes and Baculi dismiss MacGregor for medical non-compliance related to abuse of her pain medications, but an emergency room physician, Dr. Jacques, discussed with MacGregor the importance of weaning herself off her heavy use of opiate pain medication. Tr. 290. The ALJ also noted that despite

alleging a disability onset date of January 15, 1991, the medical records do not begin until 11

years later in January 2002, thereby leading to the inference that her symptoms were not severe

enough to seek treatment.  Tr. 17.  The ALJ may draw an adverse inference as to the credibility

of MacGregor's disabling symptoms from this unexplained failure to seek treatment.  *Bruton v.*

*Massanari*, 268 F3d 824, 828 (9th Cir 2001).

 While not the only interpretation of the evidence, the reasons given by the ALJ for

discrediting MacGregor's account of her limitations were clear and convincing.  The ALJ

considered the proper factors and drew logical inferences supported by a rational interpretation

of substantial evidence in the record.  Therefore, the ALJ's credibility determination should not

be disturbed.

## IV. Remand

 After finding that the ALJ erred, this court has discretion whether to remand for an

immediate award of benefits or for further proceedings.  *Harman v. Apfel*, 211 F3d 1172, 1178

(9th Cir), *cert denied*, 531 US 1038 (2000).  A remand for an award of benefits is appropriate

when no useful purpose would be served by further administrative proceedings because the

record has been fully developed and the evidence is not sufficient to support the Commissioner's

decision, and it is clear from the record the ALJ would be required to award benefits.  *Holohan*

*v. Massanari*, 246 F3d 1195, 1210 (9th Cir 2001); *Rodriguez  v. Bowen*, 876 F2d 759, 763 (9th Cir

1989).

 Even fully crediting Dr. Barnes' opinion, it is unclear whether the ALJ would be required

to award benefits because the record does not contain information regarding the impact of

MacGregor's age and non-exertional impairments on her ability to sustain full-time work.

Accordingly, a remand is appropriate in order to obtain testimony from a VE regarding whether MacGregor is able to perform the full range of sedentary activity given her age and non-exertional impairments.

## RECOMMENDATION

For the reasons discussed above, the decision of the Commissioner should be REVERSED and this case should be REMANDED for further proceedings.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due March 25, 2010. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 8th day of March, 2010.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge